HALL SIGNAL CO. v. UNION SWITCH & SIGNAL CO.

(Circuit Court, W. D. Pennsylvania. February 6, 1901.)

1. PATENTS—VALIDITY—CLAIM OF JOINT INVENTION.
    A patent issued to a single individual is prima facie evidence that he was the inventor of the device shown, and it can only be overthrown on the ground that the invention was joint by the clearest and most reliable evidence.

2. SAME—VALIDITY AND INFRINGEMENT—RAILWAY SIGNALING DEVICE.
    The Buchanan patent, No. 497,489, for an improvement in circuit-controlling devices for use in automatic railway signaling apparatus, and designed to overcome the dangers resulting from lightning fusion in the Robinson system, was not anticipated, shows invention, and is valid; also held infringed.

In Equity. Suit for infringement of letters patent No. 497,489, granted to John P. Buchanan May 16, 1893, for a circuit-controlling device.

Alan D. Kenyon and Wm. Houston Kenyon, for complainant.
Marshall A. Christy and George Christy, for defendant.

BUFFINGTON, District Judge. This bill charges infringement of letters patent No. 497,489, granted May 16, 1893, to the complainant, as assignee of John P. Buchanan, for an improvement in circuit-controlling devices. The patent relates to automatic railway signaling apparatus. Its principal object was to overcome the dangers resulting from lightning fusion in the ordinary Robinson closed track circuit system. That system is illustrated in the accompanying sketch:

The rails composing the sides of block T are electrically connected at their abutting ends, and the two continuous lines thus made are, at the block ends, transversely connected electrically with each other, and insulated from the abutting blocks. An unbroken electric current path covering each entire block is thus made. A galvanic battery, B, the opposite poles of which are connected to the opposite rails, is placed at one end of the block, and the terminals of the coil of an electro-magnet, M, are attached to the opposite rails at the other end. When the block is free from trains, or in a condition of safety, there is a continuous current flowing from the positive pole of the battery, B, thence through one rail line the entire block length, thence transversely and through the magnetic coil, M, to the other rail line, thence by the latter to the end of the block, and thence transversely to the negative pole of the battery. This safety condition is automatically signaled to the engineer by a signaling apparatus actuated by this electric current. The current passes through the coils of the electro-magnet, energizes it, and puts it in a magnetic condition, so that the armature, D, is attracted to it against the tension of the retractile spring, F. Attached to such armature is a bar, E, pivoted at the lower end, and adapted to be moved between the stops, H and G. It will thus be seen that, so long as the current flows, the upper end of the bar will rest against the front contact, H. When the current ceases, the bar will be drawn by the spring from H, and rest against the back stop, G. The armature bar, E, and the front contact, H, are both made of conducting material, and are members of a secondary circuit embracing a battery, I, and a signal magnet, S. This mechanism is so controlled by the magnet, S, that when that magnet is energized and in magnetic condition, a safety, and, when de-energized, a danger, signal will be displayed. When the block is clear, the path of the secondary current is from the positive pole of the battery, I, to the foot of the armature bar, E, front contact, H, through one terminal of the signal-operating magnet, S, through coils of said magnet to its other terminal, and thence by wire or ground to the negative pole of battery I. It will thus be seen that, so long as the primary current flows in the path described, and holds the armature bar, E, against the front

contact, H, the secondary current is closed, the magnet, S, energized, and the signal held at safety; thus indicating to the engineer of an approaching train that the block, T, is vacant. When his train enters the block, the wheels and axles establish a new electrical connection between the rails, which, during the train's passage through the block, affords a current path of less resistance than through the electromagnet, M. The current from the battery is therefore shunted or short-circuited through the wheel-axle connection, the magnet of M is demagnetized, and this releases the armature bar, E, which is drawn by the spring, F, from its front contact, G. The break of the contact between H and E breaks the current path from the battery, I, of the secondary circuit, de-energizes the signal-operating magnet, S, and throws the danger signal. When the train leaves block T, the current will again flow through M, H and E will re-engage, the secondary circuit be restored, and the signal returned to safety position.

But this mechanism was open to a grave objection. If the wires were struck by lightning, and received a greater charge of electricity than they could carry, a high heat would be generated at these contacts, and the stop, H, and armature bar, E, become fused and welded together. When this happened, and thereafter a train entered the block, although the current would short-circuit through the wheel-axle transverse connection and electro-magnet M be de-energized, the spring, F, was powerless to break the welded contact of H and E, and the secondary circuit would still continue to display a safety signal, although a train was upon the block. It will be seen that the mischief was not alone that the signaling system was rendered inoperative, but that it was left in a misleading condition, where it represented safety when the actual condition of the block was that of danger. To obviate such danger from fusion, as well as when too fine an adjustment or other cause had closed fixedly the controller of the secondary circuit, the device of the patent in suit was intended. Not only does it do this, but it enables the signaling system to continue its work in spite of such permanent closure.

The accompanying sketch will explain its operation:

The main relay circuit runs through the magnet V, which operates the signal, and through the lever L. This lever, L, and its contact point, H, are the normal or primary circuit controllers. Such control is effected by making or breaking the circuit of battery J through V, thus energizing or de-energizing the magnet and operating the signals. Lever E is the armature bar of magnet A, and is the secondary circuit controller. When magnet A is energized, lever E pushes lever L against contact point, H, thus closing the circuit through V. When

magnet A is de-energized, E is retracted by a spring, not shown in the patent sketch, but an obvious mechanical expedient, and L by a like spring. This breaks the circuit at H. A piece of nonfusible insulation, P, attached to one of them, prevents the current from passing through L and E. A piece of insulation on magnet A (designated in the patent as Q of Fig. 1) prevents E from sticking to such magnet. This magnet is connected to the track system as shown in the Robinson sketch, and is affected by the wheels of the trains on the block in the manner already shown. When this block is clear, the passing current energizes magnet A, lever E is drawn to it, lever E pushes lever L to point H. This closes the circuit, energizes magnet V, and displays the safety signal. When a train enters the block, the magnet A is de-energized, E and L are retracted, the circuit through L, H and V is broken, and the danger signal thrown. Now, if lightning fuses L and H, or too fine adjustment prevents their effective operation, the useful function of the secondary circuit controller, E, comes at once into play. If the train enters the block after such fusion or other permanent union of H and L, the magnet A is at once de-energized, and the lever E is drawn to its back stop, G. Owing to its then separation from the back stop, G, and the insulations, P and Q, the lever E was not affected or fused by the lightning stroke. In falling back to its back stop, G, it is obvious that E makes a shunt circuit around magnet V, that magnet is de-energized, and the danger signal displayed. The course of the shunt current is from left of battery I to H, down L, and up to the fulcrum of E, thence through E and G to the other side of battery I. But not only does this simple expedient serve when a train enters the block to throw the signal to danger in spite of the fusion of H and L, but when the train leaves the block, and the magnet A is energized, E moves forward, breaks the shunt current at G, and the main current, owing to the fusion of H and L, resumes its course through magnet V, and throws the safety signal; or, in other words, continues the general efficiency of the system.

The patent sets forth that the invention "relates to circuits and to means for controlling the current therein," and the object of the controlling means "is to provide a path for the current through a translating device, included in a circuit, and to exclude the current from said translating device at the proper time with a greater degree of certainty than has heretofore been attained." The controlling device, which the patentee defines as "a relay," "comprises two or more pairs of contact points connected with a circuit, any pair of which will act, when in one position, to exclude the current from the translating device, and when all the pairs of contacts are in their other position a path through the translating device will be provided." The essential elements of the invention are again defined by the patentee as following:

"As long as the pairs of contact are so arranged that when all are in one position a path for the current is provided through the circuit, and when either pair is in the reverse position current is excluded from the circuit, it is obvious that there is no departure from the true spirit of my invention."

115 F.—41

The device was self-operative, and it is clear that in its operation the invention provided for two, and only two, positions or conditions of the pairs of contacts. One position was such that, when both pairs of contacts were in that position, the current would necessarily whole-circuit. The other, which he defined as the "reverse position," is one such that when either pair of contacts was in such reverse position, the current would necessarily short-circuit. In other words, the joint action of both pairs of contact was essential to long-circuiting, the separate action of either pair could effect short-circuiting. Not only was the invention defined as relating to these two positions, but it was illustrated and applied to a mechanism where there were but two positions. Railroad signals are thrown into and rest in but two positions, viz., safety and danger. When they were placed in one position, the object of the device was to leave them there until electric movement changed them to another. This change was made, and was only made, when one or both pairs of contacts were in the reverse or nonreverse position. The reverse and nonreverse were the only regular positions. There were no other or intermediate ones. Now, it is quite clear that no such result was produced by any of the patents cited in anticipation; neither do any of them disclose the means or method by which Buchanan produced this result. The same may be said of the electric publications cited. Although the dangers resulting from lightning fusion were known, no one found in these alleged anticipations a mechanism susceptible, by mere mechanical improvement, of barring such danger. Resemblance to Buchanan's device, and, indeed, anticipation thereof, by these publication devices, are now alleged; but it is clear to us that such alleged resemblances are fancied, and not substantial. These devices must be considered not in the light of Buchanan's subsequent advance, but apart from it. Suppose Buchanan's patent were earlier, could it be held that these devices infringed it? While both were electrical devices, it is clear that their purpose and office were wholly different. These appliances were used by operators for duplex telegraphy, and it was only when operators were present that they were of use. They were not automatic. Their purpose was not to avoid or counteract fusion from lightning. If the apparatus, with its delicate and accurate adjustment, was fused by lightning, it was at once replaced. In the nature of things, there would be no special attention paid to its working when it was so struck. It is not shown that the supposed case of the welding of the sliding spring and the upper contact point ever happened, or was known, or even thought of. Moreover, it will be noted that the practical use of the mechanism contemplated but two positions,—one when the key was depressed, the other when it was raised. The instantaneous transitory passage of the current over the shunt course during the instant the key is moving between its two positions was an incidental matter, and served simply to provide, for the briefest time, between the breaking of one contact and the making of the other. It was simply intended to secure circuit continuity. The more the time be minimized, the better. Thus it is said:

"If the springs are adjusted too far apart, there will be a break in the circuit, as the lever will break contact with one spring before it touches the other; if too near together, the battery will be placed on short circuit too long, from one contact being made before the other is broken. By careful adjustment this period can be reduced to almost nothing, and, the more accurate this adjustment, the better will be the performance of the apparatus."

It will thus be seen that, while there is a general resemblance, in that in both a shunt current is used, the objects to be attained were wholly different. In one the shunt current is used to avoid a momentary break of current continuity through the entire mechanism. In the other the shunt current is maintained for an indefinite time, and during such time the current effected the positive result of operating the signaling mechanism. In the one device, the permanent maintenance of the shunt current would result in suspending the practical working of the mechanism, to wit, the transmission of messages; in the other, it had the positive effect of displaying the desired signal. The wide divergence between these two devices in form, object, and operation was such that the change from the one to the other was more than mechanical improvement. The only thing in common was the perfectly familiar function of a shunt current, but, in our judgment, the mechanism used by Buchanan to short-circuit the current for the purposes he used it would not suggest the use of a shunt current, and the mechanism employed in maintaining circuit continuity, in the duplex system. E converso the duplex system did not suggest its use or the method of its use in the Buchanan. Be it observed that the use of a shunt current per se was not the novelty of Buchanan's invention, but its use in connection with pairs of contacts so arranged that when both pairs were in one position the current did not shunt, but when either was in the other it did. The alleged anticipation shows no such mechanism and no such object.

Another defense, to which brief reference will suffice, is that the patent in suit is void, because the invention was the joint work of one Scott and Buchanan, the patentee. The patent, issued to Buchanan alone, is prima facie correct and valid, and the defendant can overthrow it only by the clearest and most reliable testimony. 3 Rob. Pat. § 1032, and cases cited; Walk. Pat. § 516. The proofs in this case do not reach that standard. The alleged joint inventor, Scott, is dead, and we are without testimony from him in that regard, but his explicit disavowal of any such claim is clearly shown. Mr. Hall, the president of the complainant company, testifies that during his negotiations with Buchanan for the purchase of the patent he asked Scott as to Buchanan's interest; that Scott told him Buchanan was the sole inventor, and that the only interest he had in it was a prospective one, viz., a half interest in the sale of the invention which he hoped to make to the Union Switch & Signal Company on Buchanan's behalf. S. M. Young, apparently a wholly disinterested witness, testifies to hearing Mr. Scott make this same disavowal of joint inventorship. And the witness White, who was present when Buchanan first showed his invention to Scott, testifies that Scott there accredited the invention to Buchanan, and that a joint

interest in the proceeds of its sale was then arranged. In view of Mr. Scott's own disclaimer of joint inventorship with Buchanan, but of his (Scott's) conditional joint sharing of the proceeds of the sale of the invention to the Union Switch & Signal Company, the use of certain ambiguous statements by both Scott and Buchanan would seem to apply rather to their joint interest in the proceeds of the sale of the invention, and not to their joint inventorship. The several sketches found in Scott's possession after his death have received due consideration. When they were made, for what purpose, or the circumstances under which they were made, are not shown. Viewing them in the strongest light, the most that can be said of them is that they throw some uncertainty on the inception of the invention. But even such uncertainty is far from the measure of positive proof required to overcome the prima facies of the patent. It is to be noted, however, that these sketches would rather seem to have been simultaneously prepared, and that by one person, than to have been drawn at the times alleged. Although having dates months apart, they are drawn on the same kind of paper. A further difficulty arises when the testimony of White is considered. His testimony, at least negatively, proves the sketch of May 2, 1890, which is in ink, was not exhibited that day. White states that before Scott came in Buchanan made a pencil sketch to show the witness. The sketch dated June 9th, which is now claimed to embody the invention, was evidently not made at that interview. White says that Scott's suggestions were made in a pencil sketch. This seems probable. That Scott should then have at hand and use the same kind of paper as Buchanan's sketch of May 2d, that he should carefully do it in ink (and seemingly the same ink), and with the elaboration of border, finish, and detail shown, is quite improbable. Then, too, we have the explicit testimony of White that even in the pencil sketch of Scott Buchanan showed him at once wherein such design was lacking, and at Buchanan's suggestion the essential parts were added. To avoid this patent on a finding based on surmises instead of proofs, upon suggested doubt instead of proved certainties, would be at variance with the well-grounded principles of the patent law, and dangerously affect the stability of many patents in that regard.

In view of the stipulation in the case as to the devices sold to the Central Railroad Company of New Jersey, and the uncontradicted testimony of the complainant's expert as to the same, we deem it needless to further extend this opinion by discussing the subject of infringement. We find infringement of all the claims except the tenth.

Let a proper decree be drawn.